**IN THE UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF NORTH CAROLINA**
**CASE NO. 1:19-CV-316**

———————————————————————

| | |
|---|---|
| JULIA GRAVES,<br>as Administratrix of the Estate of<br>Uniece Fennell, Deceased, | ) )<br>)<br>) |
| | ) |
| Plaintiff, | )    CIVIL ACTION |
| | ) |
| v. | )<br>) |
| DURHAM COUNTY, | ) |
| | )    JURY TRIAL, TEMPORARY |
| CLARENCE BIRKHEAD, Sheriff,<br>Durham County, | )    RESTRAINING ORDER, AND<br>)    PRELIMINARY INJUNCTION |
| | )    DEMANDED |
| MICHAEL D. ANDREWS, Former<br>Sheriff, Durham County, | )<br>) |
| | ) |
| MICHELLE HENDERSON, former<br>Correctional Officer, Durham Co.<br>Detention Facility, | )<br>)<br>) |
| | ) |
| FNU JACKSON, Sergeant, Durham Co.<br>Detention Facility, | )<br>) |
| | ) |
| FNU TAYLOR, Correctional Officer,<br>Durham Co. Detention Facility | )<br>) |
| | ) |
| TANISHA STRIPLING, Correctional<br>Officer, Durham Co. Detention Facility, | )<br>) |
| | ) |
| TRAVELERS CASUALTY AND<br>SURETY COMPANY OF AMERICA,<br>                As Surety | )<br>)<br>) |
| | ) |
| Defendants. | )<br>) |

Julia Graves, as Administratrix of the Estate of Uniece Fennell (hereinafter Uniece

Fennell), by and through counsel, brings this Complaint against Defendants Sheriff Birkhead,

former Correctional Officer Michelle Henderson, and Correctional Officers FNU Taylor, FNU Jackson, and Tanisha Stripling.

INTRODUCTION

1. This is an action brought under 42 U.S.C. § 1983; N.C. GEN. STAT. §§ 28A–18–2 and 58–78–5; and North Carolina common law, arising from the death of Uniece Fennell. Uniece Fennell died on March 23, 2017 in pretrial detention at the Durham County Detention Facility (alternately "Durham County Jail" or "DCDF") in Durham, North Carolina. As such, at all times relevant to this action Uniece was in the care, custody and complete control of the Defendants, all of whom shared responsibility for administering services at the Durham County Jail and were acting under color of state law.

2. Uniece was found by jail officials hanging from a bedsheet attached to the bar across the raised window of her cell, located on the fifth floor of the detention center. At the time of her death, Uniece was a minor being detained among adult inmates.

3. Uniece Fennell's death is the result of the wrongful conduct, deliberate indifference, and the joint and several negligence of the Defendants. Their actions and inactions proximately caused Ms. Fennell's death, in violation of the Eighth and Fourteenth Amendments of the United States Constitution, North Carolina wrongful death and official neglect statutes, and North Carolina common law.

JURISDICTION AND VENUE

4. This action is brought, *inter alia*, pursuant to 42 U.S.C. §§ 1983 and 1988, as well as the Eighth and Fourteenth Amendment of the United States Constitution. Jurisdiction is founded upon 28 U.S.C. §§ 1331, 1343(a)(3), and the aforementioned constitutional and statutory provisions.

5. Pursuant to 28 U.S.C. § 1367(a), this Court has supplemental jurisdiction over the State law claims including wrongful death, negligent hiring, failure to supervise and train, official neglect, intentional infliction of emotional distress, and negligent infliction of emotional distress, since those claims arise out of the same set of facts and form part of the same case and controversy.

6. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2) and other applicable law because the cause of action arose in Durham, North Carolina, which is situated within the district and divisional boundaries of the Middle District of North Carolina.

<u>PARTIES</u>

7. The allegations contained in the previous paragraphs of this Complaint shall be fully incorporated and re-alleged as if fully set forth herein.

8. Plaintiff JULIA GRAVES is the lawfully designated Administratrix of the estate of her deceased daughter, Uniece Fennell ("Uniece" or "Fennell").

9. Defendant CLARENCE BIRKHEAD is the current Durham County Sheriff. Sheriff Birkhead has a duty to train and supervise officers in his command. As the Sheriff, he is responsible for overseeing correctional officers and the daily functioning and administration of the jail. He is a keeper of the jail pursuant to N.C. GEN. STAT. § 162–55 and appoints other keepers of the jail. He is sued in his official capacity.

10. Defendant MICHAEL D. ANDREWS is the former Durham County Sheriff and was the Sheriff at all times pertinent to this action. Former Sheriff Andrews had a duty to train and supervise officers in his command, and to discipline officers who willfully neglect caring for inmates in their custody. He was responsible for overseeing correctional officers and the daily functioning and administration of the jail, including providing essential medical care

3

and assuring that detainees receive necessary medical and mental health care and are housed in a safe, secure, and humane facility. He was a keeper of the jail pursuant to N.C. GEN. STAT. § 162–55 and appointed other keepers of the jail. Former Sheriff Andrews' actions and inactions were undertaken with deliberate indifference to Uniece Fennell's health and safety. He is sued in his individual and official capacities.

11. Defendant MICHELLE HENDERSON was a correctional officer employed at the Durham County Detention Center at all times pertinent to this action. Upon information and belief, Officer Henderson had responsibility for security in the unit in which Uniece was housed for most of the time she was incarcerated. Officer Henderson was aware Uniece was being bullied by other women in the unit, failed to adequately protect Uniece from repeated attacks, and actively antagonized and taunted Uniece. Upon information and belief, Officer Henderson was either terminated or left her position at the jail around the time Uniece Fennell was discovered dead in her cell. While she was employed by the Sheriff's Office, Michelle Henderson was a keeper of the jail pursuant to N.C. GEN. STAT. § 162–55. Michelle Henderson was deliberately indifferent to Uniece Fennell's safety and emotional and physical well-being. She is sued in her individual and official capacity.

12. Defendants F.N.U. TAYLOR, F.N.U. JACKSON, and OFFICER TANISHA STRIPLING were among the correctional officers on duty the night of Uniece Fennell's death and they received specific information about Fennell's intention to commit suicide. All three are keepers of the jail under N.C. GEN. STAT. § 162–55. Defendants Taylor and Jackson failed to take appropriate action to protect Fennell from harm when provided with specific information indicating Fennell was in imminent danger of death. Defendant Stripling was responsible for making regularly scheduled rounds and making visual contact with inmates

4

on the unit, including Uniece Fennell, and she failed to do so in the required time frame. They are sued in their individual and official capacities.

13. Defendant Durham County is a body politic and corporate existing under and existing by virtue of Chapter 153A of the North Carolina General Statutes. Durham County is capable of suing and being sued per 42 U.S.C. §§ 1981, 1983, and 1986. The County, through its Board of County Commissioners and under N.C. GEN. STAT. §§ 153A–217 and 153A–218, is responsible for appropriating funds for the Sheriff's Office and funds for jail construction and maintenance, and is responsible for putting the jail into operation, the jail medical plan for the treatment of inmates, and for providing and paying for medical services for inmates incarcerated at the jail.

14. Upon information and belief, Defendant Travelers Casualty and Surety Company of America (hereinafter "Defendant Surety") is a corporation recognized under the existing laws of the State of Connecticut whose office is located at One Tower Square, Hartford, CT 06183-6014. Defendant Surety is authorized to do business in North Carolina by the North Carolina Department of Insurance/Commissioner of Insurance and is subject to service of process through the Commissioner of Insurance pursuant to Article 16 of Chapter 58 of the North Carolina General Statutes. Defendant Surety provided a Sheriff's Bond for Sheriff Birkhead and former Sheriff Andrews as required by N.C. GEN. STAT. § 162–8 and N.C. GEN. STAT. § 58–72–1, *et seq.*, and said bond was in effect at all relevant times complained of herein.

## WAIVERS OF IMMUNITY

15. The allegations contained in the previous paragraphs of this complaint shall be fully incorporated and re-alleged as if fully set forth herein.

16. The Surety furnished a bond or bonds pursuant to N.C. GEN. STAT. § 162–8 covering Former Sheriff Andrews and Sheriff Birkhead, and Surety is a named Defendant party to this action, as required by N.C. GEN. STAT. § 58–76–1, *et seq*.

17. Upon information and belief, Former Sheriff Andrews, Sheriff Birkhead, and any and all agents, employees, officers, and healthcare providers waived sovereign and governmental immunity that might have been raised by virtue of Surety's bonds and to the extent of said bonds and other liability insurance.

18. Upon information and belief, Durham County, Former Sheriff Andrews, Sheriff Birkhead, and any and all agents, employees, officers, and healthcare professionals waived any sovereign and/or governmental immunities that might have been raised in that, in addition to said Sheriff's bonds, Durham County and the Durham County Sheriff's Office had in force, at all relevant times, plans of insurance and County resolutions that waived immunity and established a funded reserve pursuant to N.C. GEN. STAT. § 153A–435, and participated in a local government risk pool pursuant to Article 23 of Chapter 58 of the North Carolina General Statutes, to cover acts, omissions, negligence, and/or misconduct as alleged hereinafter by Plaintiff. Durham County participates in a risk management pool through A.J. Gallagher Insurance, Risk Management & Consulting. A.J. Gallagher is headquartered in Raleigh, North Carolina with additional offices in Greensboro, North Carolina.

<u>FACTUAL ALLEGATIONS</u>

19. The allegations contained in the previous paragraphs of this Complaint shall be fully incorporated and re-alleged as if fully set forth herein.

20. The Durham County Detention Facility primarily houses, and is intended to primarily house, people who have been charged but not yet convicted of crimes. Most of the Durham County

Jail's inmates are indigent and cannot afford bail. The jail has not been built with long-term incarceration in mind, and, for example, lacks an outdoor facility.

21. Durham County Detention Facility policies provide that minors are to be given sleeping quarters separate from adults. Moreover, federal law provides that a "youthful inmate shall not be placed in a housing unit in which the youthful inmate will have sight, sound, or physical contact with any adult inmate . . . ." Prison Rape Elimination Act, 28 C.F.R. § 115.14.

22. Despite these policies, it is the practice of the Durham County Detention Facility to enable adult detainees to have physical access to youthful detainees. As such, minors incarcerated in the DCDF routinely interact, both verbally and physically, with adult detainees, including adult detainees charged with serious violent felonies.

23. On August 31, 2017, the North Carolina Legislature passed the Juvenile Justice Reinvestment Act, which changes the age of criminal responsibility from sixteen to eighteen. Juvenile Justice Reinvestment Act, 2017 N.C. SESS. LAWS 157. A key component of this act will require that "[a]ll persons less than 18 years of age who are ordered to be held in custody prior to their trial or adjudication, whether in adult court or juvenile court, shall be housed in an approved Juvenile Justice Section facility, and not incarcerated in county jails (unless the county jail has an agreement with the Juvenile Justice Section to house juveniles)." JUVENILE JURISDICTION ADVISORY COMM. – LEGIS. & FUNDING RECOMMENDATIONS: RAISE THE AGE LEGIS. RECOMMENDATIONS (Jan. 17, 2019).

24. The Chief authority over the Durham County Detention Center is Sheriff Clarence Birkhead, an elected official. At all times relevant to this complaint, the Chief authority over the jail was Former Sheriff Michael Andrews. There is no civilian oversight board. The jail is a

public operation but many of the essential services for detainees, including medical services, are provided by private, for-profit contractors.

25. Uniece Fennell, then age 16, was arrested on July 26, 2016 and was a detainee in the Durham jail until her death on March 23, 2017.

26. Uniece had a traumatic childhood in California that continued when she moved to North Carolina with her family. She and her twin brother, Demoraea, were born to their mother, Julia Graves, out of an abusive relationship with their father Glenn.

27. Glenn went to jail when Julia was six months pregnant with Uniece and Demoraea, and he was released two days before they were born. Glenn regularly did drugs in the home they lived in with their five children. In 2003, Julia, tired of the physical abuse, drug use, and threats of violence, removed Glenn from the house.

28. Uniece was depressed and missed a fair amount of school as a result of family turmoil while she was in middle school. In an effort to give her children a fresh start, Julia moved the family to Durham, North Carolina. The night before they moved, Uniece's twin brother, with whom she was very close, ran away and the family was forced to leave him behind. For months Uniece would wake up in the middle of the night, hyperventilating, after having dreams of her brother being killed in California.

29. While at school one day in Durham, Uniece was slammed to the floor by a school resource officer and suspended for fighting and was not allowed to return until she had undergone a mental health evaluation. Her evaluator recommended she receive mental health treatment.

30. Eventually, Uniece's twin brother was able to join the rest of the family in Durham and remained the only person who was able to calm her down when she fell into fits of depression and anger.

31. In July 2016, Uniece was arrested and sent to the Durham County Jail. At the jail, Uniece was placed in close quarters with adult detainees.

32. In November 2016, Uniece's twin brother Demoraea was shot to death in Durham. Uniece was unable to grieve with her family, and she took his death hard. Uniece and her brother were very close, and after he died she fell into a deep depression. Jail staff at DCDF recognized her suicidality and placed Uniece on suicide watch as a result.

33. Three to four days later, staff removed Fennell from suicide watch, and she rejoined her fellow detainees in the women's unit. Upon information and belief, Uniece did not receive formal medical care for her mental health circumstances.

34. Once back in the unit, Uniece was regularly subjected to abuse by fellow inmates and jail staff. The abuse persisted over a period of months.

35. In the early hours of March 23, 2017, Uniece Fennell, by then 17 years old, was found hanging by the neck from a bedsheet attached to a bar that was affixed to the raised window in her cell on the fifth floor of the Durham County Jail. Her death was ruled a suicide by the state Office of the Medical Examiner. *See* App'x 10 (Report of Investigation by Medical Examiner).

36. Upon information and belief, at the time Fennell was found in her cell, Defendants FNUs Taylor and Jackson and Defendant Tanisha Stripling were on duty and responsible for the safety and security of inmates on the unit.

**A Pattern of Deaths by Hanging in the Durham County Detention Facility**

37. The type of bar from which Fennell was discovered hanging was mounted in front of a shatterproof window, was ubiquitous throughout the jail, and has been a source of controversy for a number of years.

38. There have been numerous suicide attempts by hanging at DCDF, and three confirmed hanging deaths since 2012. Various records indicate, however, that inmates have been hanging themselves since the jail was constructed in 1996. A June 27, 2002 memorandum from the Sheriff's Office relates that "the window bars in the inmate cells" were being "used by inmates as a means to commit or attempt suicide." *See* App'x 1 (Memorandum, Suicide Prevention Measures, County of Durham, Office of the Sheriff, June 27, 2002). The memorandum relates four suicides by hanging in the jail between 1996 and 2002.

39. More than 15 years have passed since the sheriff's office first recognized that "changes [are] necessary to aid in the prevention of suicide." App'x 1. In 2003, Defendant Andrews' predecessor, Sheriff Hill, urged that "every possible attempt be made to correct these structural facility problems as soon as possible," *see* App'x 2 (Letter from Sheriff Worth L. Hill to Mike Ruffin, County Manager, March 11, 2003), and stated that such corrections "will dramatically reduce potential or possible suicides at the Durham County Detention Center." App'x 3 (FY 2004-2013 CIP Project Description Form, Suicide Prevention Upgrades—Detention Center, prepared by Col. George Naylor, Office of the Sheriff, Durham County).

40. These corrections, however, were never made due to the fact that "the project was never funded[.]" *See* App'x 4 (Letter from Mark Hale, Senior Facility Manger, Aramark Correctional Services Facilities, to Lt. Col. Natalie Perkins, Director of Detention Services, Durham County Detention Facility, August 30, 2010).

41. Defendant Andrews became Sheriff of Durham County in 2011, following Hill's retirement from office. As Sheriff, Defendant Andrews was aware that a failure to act increased the prospect of future inmate suicides, and he showed deliberate indifference to that risk.

42. Early in his tenure, Andrews' office convened suicide prevention meetings where his staff specifically discussed "proposals . . . to modify the facility such as removing bars from window[s,] . . . which inmates who have committed suicide in the past have used . . . to tie objects placed around their neck." *See* App'x 5 (Notes, Suicide Prevention Task Force Initial Meeting, Detention Center Conference Room, August 14, 2012). This concern, however, failed to translate to action.

43. Following Ms. Fennell's death in 2017, Defendant Andrews characterized the hanging hazard in the jail as "critical" and said that it is "essential" that it be remedied. *See* App'x 6 (Letter from Sheriff Michael D. Andrews to Wendell Davis, County Manager, April 11, 2017). The County obtained a quote for the cost of the modification and it was estimated it would cost less than $90,000. *See* App'x 7 (Quote, Cell Window Modifications, April 6, 2017).

44. Over the years, the State of North Carolina has also urged Defendant Andrews' office to make the necessary corrections. On March 17, 2011, state jail inspector Litonya Carter identified the type of bar from which was Fennell was discovered as a "hanging hazard" and advised jail administrators to research alternative options. App'x 8, at 11 (N.C. DHHS Semiannual Inspection Report (March 17, 2011)).

45. On March 14, 2013, inmate Terry Demetrious Lee committed suicide while incarcerated in the jail by tying a bedsheet to the bar and hanging himself. Following Mr. Lee's death, State Jail Consultant and Inspector Chris Wood again wrote a letter to Defendant Andrews, drawing attention to the hazard presented by these types of bars. Mr. Wood wrote "[t]he design of the bar that is mounted over most windows in the facility does not prevent an

11

inmate from using this design to facilitate suicide." App'x 11 (Letter from NC DHHS State Jail Consultant Chris Wood to Sheriff Michael D. Andrews, June 26, 2013).

46. Wood's letter indicates the jail represented to the State that it had undertaken a project to address the issue, but Wood expressed concern that the modifications were only made to "bars in the [inmate] classification area." At the conclusion of his letter, Wood asked officials directly, "Will the Detention Center create a corrective action plan for modifying the current window design and what will that plan be?" App'x 11.

47. It is unclear how DCDF responded to Wood's inquiry, but more than four years later, jail official Sean Barnes told the Durham Grand Jury that 40% of the bars had still yet to be modified, and the "schedule for the improvement of the other 40% remains unclear." *See* App'x 9 (Special Report of Durham Grand Jury B on the Durham County Detention Facility, at 3 (June 26, 2017)).

48. Barnes' comments were made to the Grand Jury in June 2017, during an inspection made pursuant to N.C. Gen. Stat. § 15A-628(a)(5).

49. During the inspection, the jury specifically inquired about the issue of the window bars presenting a hanging hazard. Defendant Andrews' representative provided false information to the grand jury, stating that "there had been no suicides in 2017." *See* App'x 9, at 3 (June 26, 2017).

50. Upon information and belief, there have been several unreported suicide attempts at the jail by individuals who have tried to hang themselves using the same method. One such incident, involving an African-American woman, took place in November of 2016 and was witnessed by Uniece Fennell. Fennell and other women in the unit watched as officers cut her down from the window bar and prepared her to be transported to the hospital. Upon information

and belief, another incident, also involving an African-American woman, took place in cell 16, and yet another incident took place in cell 32.

51. In sum, Defendant Andrews was on notice for the duration of his tenure as Sheriff regarding the critical danger the hanging hazard posed to the safety of inmates in his custody: He inherited multiple memorandums, letters, and reports from the previous sheriff apprising him of the bars' dangerousness.  He was warned by multiple state jail inspectors, who repeatedly urged him to address the issue.  He was notified of multiple successful and unsuccessful suicides by hanging that have occurred on his watch.  Despite this, Defendant Andrews failed to take corrective action to address this hazardous condition.

52. On June 12, 2018, Defendant Andrews posted on his personal Facebook page an article from the Durham Herald Sun stating the County had known as early as 2002 that the window bars at the jail were suicide hazards. *See* App'x 16 (Virginia Bridges, *Teen hanged herself in jail. Attorney says Durham County ignored hazard*, THE DURHAM HERALD SUN, June 12, 2018). The caption Defendant Andrews wrote alongside this article stated "Oh ,so [sic] now the actual facts are being reported," suggesting the County was at fault for failing to address the window bars.

53. At a June 25, 2018 Durham County Commissioner meeting, Chairwoman Wendy Jacobs issued a statement in direct response to the above-mentioned *Herald Sun* article.  In her statement, Chair Jacobs said the County is responsible for developing a County Improvement Plan (CIP) to fund major projects.  Chair Jacobs stated that she had staff research CIP requests from 2002 onward and found that in the 2004-2013 CIP there were the following Proposed Detention Center Projects: (1) a $40,000 anti-suicide window modification proposal for 432 windows, and (1) a $1,230,000 proposal to install anti-suicide air vent grills

for 12 pods, booking cells and the medical wing. However, she said, approval for the proposals must be brought before the Commissioners and there was no record these proposals ever made it that far and the projects were never completed or even commenced. *See* App'x 15 at 4 (Durham County Meeting Minutes Board of County Commissioners, June 25, 2018).

54. The back and forth letters between the County Commissioners and the Sheriff's Department dating as far back as 2002, in addition to the statement made by Defendant Andrews and Chair Jacobs on June 12, 2018 and June 25, 2018, respectively, show the County and the former Sheriff have blamed each other for failing to adequately address the known suicide hazards at the jail.

**The Role of Jail Staff in the Bullying and Abuse of Uniece Fennell**

55. Upon information and belief, over her period of incarceration at the Durham County jail, during which she was one of the youngest—perhaps *the* youngest—detainee, Uniece Fennell was a victim of regular bullying at the hands of both older detainees and one or more correctional officers.

56. Upon information and belief, Fennell experienced significant bullying at the hands of numerous women in the jail. Her primary antagonists were women affiliated with the Bloods street gang, some of whom were incarcerated on Murder and/or Accessory to Murder charges and were suspicious of and antagonistic to Fennell's California roots. They also included a Durham County Correctional Officer, Michelle Henderson, who, upon information and belief, had personal and familial ties with multiple women who regularly targeted Fennell.

57. These adult detainees subjected Uniece Fennell to regular bullying, including acts of physical violence. Upon information and belief, one of Fennell's primary antagonists struck and

forcefully pushed her in the face because she could not name a Durham "set" of the Bloods and another repeatedly told her "you're never going home."

58. Had Uniece not been housed in an adult facility, she would not have been exposed to the antagonism and bullying of these adult detainees.

59. Upon information and belief, jail staff were aware of these acts of physical violence and bullying and were aware of their responsibility to protect Fennell, a minor, from abuse.

60. Upon information and belief, Fennell would cry and express distress about the bullying on a regular basis, and jail staff were aware of her distress.

61. Upon information and belief, jail staff and adult detainees made repeated statements to Fennell intended to maximize her sense of hopelessness. Specifically, staff told Fennell that, although she was just a "little girl," her life was over and she would "die in prison." Other detainees regularly threatened Fennell with physical violence, told her she would die in prison, and actively encouraged her to kill herself.

62. Upon information and belief, Fennell confided in her defense lawyer that she was experiencing problems with other women in her unit and one correctional officer in particular.

63. Hours before Fennell was found dead in her cell, her lawyer sent an e-mail to jail staff, expressing his concern about this harassment. Jail staff responded shortly thereafter, dismissing his concerns. App'x 12 (Dan Kane and Virginia Bridges, *State Report Faults Durham Jail in Teen Inmate's Suicide*, NEWS & OBSERVER, July 7, 2017).

64. Upon information and belief, the officer about whom her lawyer complained, Michelle Henderson, had a close relationship with a detainee who was among Fennell's antagonists. This detainee, as well as others, received special privileges and consideration not extended to

general detainees. Upon information and belief, to militate against such situations occurring, DCDF policy requires officers to alert their supervisor if a relative is booked in the jail in their unit.

65. These acts of special treatment and privileges were known by, or should have been known by, Defendant Andrews and the other Defendant correctional officials, who failed to adequately hire, train, supervise, and discipline staff members who violated jail policies.

66. Upon information and belief, Officer Henderson stopped working at the Durham County Jail around the time of Fennell's death.

67. Upon information and belief, during her period of employment at the Durham County Jail, Officer Henderson was in charge of unit security in the unit in which Fennell was incarcerated. During this time, Henderson showed favoritism towards certain detainees, a number of whom she maintained friendships with on Facebook. These detainees included multiple women who actively bullied, threatened, and used violence against Uniece Fennell.

**Jail Staff Ignored Fennell's Cries for Help**

68. Upon information and belief, on the night Fennell died, she was observed by jail staff to be crying loudly. Defendant Jackson responded to Fennell's cell to inquire about her well-being. Jackson broached the topic of suicide with Fennell, telling her, "If you don't stop all that crying, we'll put you on suicide watch." After a short conversation, Sergeant Jackson left Fennell's cell and took no further action.

69. The North Carolina Medical Examiner's report on Fennell's death indicates that Fennell "had been making suicidal threats," specifically stating that "she 'wanted to kill herself.'" However, according to the M.E.'s report, "no one took her threats seriously." *See* App'x 10.

70. Both common sense and industry best practices dictate that individual correctional officers should not have the discretion to disregard and fail to report information indicating that a detainee in their custody is planning to commit suicide. *See, e.g.*, Dubois v. Payne Cty. Bd. of Cty. Comm'r, 543 F. App'x 841, 847 (10th Cir. 2013); Luckert v. Dodge Cty., 684 F.3d 808, 823 n.7 (8th Cir. 2012); Wilson v. Roberts, 73 F. App'x 103, 105 (6th Cir. 2003).

71. However, according to Colonel Anthony Prignano, who administered the jail for Defendant Andrews and currently administers the jail for Defendant Birkhead, DCDF policy at the time of Fennell's death permitted correctional officers to decide on their own whether to accept or reject information indicating that detainees may be planning to commit suicide. *See* App'x 12, A1.

72. Dominic Jackson is an inmate in the Durham County Jail and was housed in the cell directly below Fennell's. Fennell regularly confided in Jackson, with whom she was able to communicate through plumbing fixtures. On the night she died, Fennell had extensive conversations with Jackson. During the early morning hours of March 23, 2017, Fennell told Jackson that she wanted to "go be with [her] brother." Fennell's twin brother, Demoraea, had been murdered months earlier in a shooting in Durham, NC. Fennell then asked Jackson, "How would you feel if I hung myself?" Alarmed at the conversation, Jackson notified an officer who was on duty in his pod, Officer Taylor, and told him that staff needed to help Fennell because "she's talking about killing herself."

73. Upon information and belief, Officer Taylor placed a telephone call to an officer on Fennell's floor. An officer then rang Fennell's cell directly. When Fennell answered, the officer inquired about the alleged suicide threat. Following a brief conversation with Fennell, jail staff took no further action.

74. Shortly thereafter, Fennell was found deceased, hanging from a bedsheet fastened to the bar in front of her cell window.

75. Upon information and belief, Defendant Andrews was grossly negligent in failing to train his staff about how to appropriately respond to a suicide threat; and jail staff failed to take action to protect Fennell, a minor, after they personally observed her distress, discussed the possibility of her committing suicide, and were given specific information by another detainee about her intent to imminently commit suicide.

76. State regulations require inmates in the jail to be checked at a minimum of twice an hour. However, a report by the state Department of Health and Human Services concluded the Defendant officers, including Defendant Stripling, did not make their required rounds during the period surrounding Fennell's death. Durham County Sheriff's Colonel Anthony Prignano confirmed this in an interview with the *News & Observer*, stating that his records show that the safety checks were not done as required. *See* App'x 13 (NC Dep't of Health & Hum. Servs., Div. of Health Serv. Reg., Statement of Deficiencies and Plan of Correction, Durham Co. Detention Facility, March 29, 2017); App'x 12, at A1.

77. State investigators also concluded that staff failed to timely respond to reports from "another inmate [who] reported [Fennell] was talking about harming herself." Id.

78. The DHHS report on the incident indicates that circumstances warranted placing Fennell on suicide watch, which requires a minimum of four checks per hour. The report found "no record of the [responding] officer contacting her supervisor or contacting medical staff to report that there had been information received that the inmate had discussed harming herself." *See* App'x 13.

79. The Sheriff's Office's initial report of the suicide states Fennell had been checked at 2:18am and not again until she was found hanging in her cell at 2:48am. *See* App'x 14 (Report of Inmate Death, Uniece Glenae Fennell).

80. The State Medical Examiner's initial report also states that Fennell repeatedly discussed harming herself. Fennell had previously been placed on suicide watch on November 1, 2016 following the death of her twin brother. This ended on November 3, 2016, after Fennell signed a document for mental health staff in the jail saying she would not hurt herself.

**Jail Officials Owe a Duty of Reasonable Care to Inmates who are Known to be Suicidal**

81. In North Carolina, "a duty of reasonable care is owed by prison or jail authorities to a prisoner to keep him safe from unnecessary harm." Helmly v. Bebber, 77 N.C. App. 275, 279, 335 S.E.2d 182, 185 (1985). The N.C. Court of Appeals has held that this "standard of reasonable care is applicable in cases involving the suicide of a prisoner." Id. at 280, 335 S.E.2d at 186. Specifically, when, as here, "authorities know or have reason to believe that [a] prisoner, unless forestalled, might do harm to himself or others, reasonable care must be used by those authorities to assure that such harm does not occur." Id. at 279, 335 S.E.2d at 185.

82. Nursing staff and facility mental health staff failed to properly and adequately assess Uniece's signs and symptoms of her severely deteriorating mental health and failed to properly and adequately intervene. In doing so, nursing staff failed to adhere to the applicable standard of care and failed to properly assess, diagnose, and intervene in Uniece's condition, which directly and proximately caused Uniece's eventual suicide.

83. As a part of the DCDF's initial intake process, all detainees undergo what is known as the Brief Jail Mental Health Screen (BJMHS). Anyone with a positive screen is referred to the

Jail Mental Health team for a follow up assessment and a determination of level of care. However, only those with a severe and persistent mental illness receive regular mental health status checks and are seen by the Jail Psychiatrist. There is nothing to indicate Uniece Fennell ever received regular mental health status checks or saw the Jail Psychiatrist beyond her two days on suicide watch more than four months prior to her death.

84. In both failing to adequately respond to Fennell's threats to herself and failing to regularly check on her as required by jail policies, Defendants did not exercise a duty of reasonable care to Fennell and proximately caused her death.

CLAIM I
Violation of the Eighth and Fourteenth Amendments
to the United States Constitution and 42 U.S.C. §§ 1983 and 1988
(Deliberate Indifference to a Serious Risk of Harm)
(Defendant Sheriff Michael Andrews, Defendant Sheriff Clarence Birkhead Defendant Michelle
Henderson, Defendants FNUs Taylor and Jackson, Defendant Tanisha Stripling)

85. The allegations contained in the previous paragraphs of this Complaint shall be fully incorporated and re-alleged as if fully set forth herein.

86. Defendants' policies, practices, acts, and omissions placed Uniece Fennell at an unreasonable and foreseeable risk of serious harm.

87. Defendant Sheriff Clarence Birkhead is currently responsible for all policies, practices, and administration at the Durham County Detention Facility and is responsible for ensuring a tragedy like Uniece Fennell's death does not occur again.

88. The Defendants violated Uniece Fennell's rights under the United State Constitution, including rights secured by the Eighth and Fourteenth Amendments, or federal law, by intentionally, willfully, maliciously, and with conscious and deliberate indifference, failing to act when they knew or should have known the Uniece faced a substantial risk of serious

harm, and by disregarding such risk by failing to take reasonable measures, which were readily available, to avoid that risk.

89. Defendants failed to take adequate steps to ensure Fennell's safety in the Durham County Detention Center.  The Eighth Amendment "imposes duties on [] officials [to] provide humane conditions of confinement . . . and [to] 'take reasonable measures to guarantee the safety of the inmates.'" <u>Farmer v. Brennan</u>, 511 U.S. 825, 832 (1994) (quoting <u>Hudson v. Palmer</u>, 468 U.S. 517, 526–27 (1984)). "A prison official's 'deliberate indifference' to a substantial risk of serious harm to an inmate violates the Eighth Amendment," *Farmer*, 511 U.S. at 828, or in the case of pre-trial detainees, the Fourteenth Amendment, *see, e.g.*, <u>Muhaimin v. Jacobs</u>, 2016 U.S. Dist. LEXIS 106330, at *5 (D.S.C. 2016) (stating that "the standards discussed in *Farmer v. Brennan* are equally applicable" in cases involving pre-trial detainees).

90. As a proximate result of Defendants' deliberate indifference to a substantial risk of serious harm, Uniece Fennell died.  Consequently, Plaintiff, on behalf of Uniece's Estate, is entitled to recover punitive damages as set out in N.C. GEN. STAT. § 28A–18–2(b)(5) to punish these Defendants for their illegal, unconstitutional, wrongful, reckless, and willful misconduct and to deter others from engaging in similar conduct in the future.

<u>CLAIM II</u>
<u>Violation of the Eighth and Fourteenth Amendments</u>
<u>to the United States Constitution and 42 U.S.C. §§ 1983 and 1988</u>
<u>(Deliberate Indifference to Medical Needs)</u>
<u>(Defendant Sheriff Andrews, Defendant Michelle Henderson, Defendants FNUs Taylor and Jackson, Defendant Tanisha Stripling)</u>

91. The allegations contained in the previous paragraphs of this Complaint shall be fully incorporated and re-alleged as if fully set forth herein.

21

92. Defendants acted with deliberate indifference to Fennell's serious mental health needs, of which they were actually aware or reasonably should have been aware.

93. The right to reasonable assessment and medical treatment while in confinement is a clearly established constitutional right, pursuant to the Eighth and Fourteenth Amendments to the United States Constitution, and is a right which any reasonable medical care provider in the position of each of these Defendants knew or should have known.

94. Defendants ignored and failed to appropriately respond to obvious signs of suicidality, and they failed to implement and/or follow practices and policies required by the North Carolina Department of Health and Human Services, which resulted in the denial, delay, or intentional interference with regard to Fennell's health and safety. Fennell did not receive an adequate mental health assessment at intake and did not receive any meaningful mental health assessment or care throughout her period of detention at the DCDF.

95. Defendants' policies, practices, acts, and omissions constituted deliberate indifference to the serious medical and mental health needs of Uniece Fennell, of which Defendants were or had reason to be aware of, and they violated the Cruel and Unusual Punishments Clause of the Eighth Amendment, made applicable to the states through the Fourteenth Amendment to the United States Constitution. Estelle v. Gamble, 429 U.S. 97, 104 (1976).

96. As a proximate result of Defendants' deliberate indifference to serious medical needs, Uniece Fennell died. Consequently, Plaintiff, on behalf of Uniece's Estate, is entitled to recover punitive damages as set out in N.C. GEN. STAT. § 28A–18–2(b)(5) to punish these Defendants for their illegal, unconstitutional, egregiously wrongful, reckless, and willful misconduct and to deter others from engaging in similar conduct in the future.

CLAIM III
Violation of the Eighth and Fourteenth Amendments

97. The allegations contained in the previous paragraphs of this Complaint shall be fully incorporated and re-alleged as if fully set forth herein.

98. Durham County was, at all times relevant herein, responsible for the formulation and execution of policies regarding the provision of medical care to inmates and detainees in the Jail.

99. Upon information and belief, at all relevant times herein, Durham County, acting under color of state law, had in effect *de facto* policies, practices, and customs that were a direct and proximate cause of the wrongful, unconstitutional, and unlawful conduct of officers and medical care providers who worked at the jail.

100. Durham County failed to implement proper plans, policies, or procedures necessary to see that inmates and detainees are provided appropriate, necessary and adequate medical and mental health care, nor did Durham County ensure detainees receive adequate and meaningful follow up treatment to identified medical and mental health needs.

101. Durham County failed to draft or institute proper plans, policies, or procedures regarding medical and mental health supervision of inmates and detainees at the Jail.

102. Durham County failed to implement proper plans, policies, or procedures by which to adequately address the repeated and continual safety concerns regarding the window-bars at the Jail.

103. Durham County failed to maintain total sight and sound separation of the juvenile and adult populations at the jail, in willful violation of federal regulations.

104.    As a direct and proximate result of said policies, practices, and customs, Uniece Fennell was denied her rights under the United States Constitution, including rights secured by the Eighth and Fourteenth Amendments and the federal laws.  Consequently, Plaintiff, on behalf of Uniece's Estate, is entitled to recover from Durham County compensatory damages in an amount in excess of $25,000.00.

CLAIM IV
Violation of N.C. GEN. STAT. § 28A–18–2
(Death by wrongful act of another)
(Defendant Sheriff Andrews, Defendant Michelle Henderson, Defendants FNUs Taylor and Jackson, Defendant Tanisha Stripling)

105.    The allegations contained in the previous paragraphs of this Complaint shall be fully incorporated and re-alleged as if fully set forth herein.

106.    On the dates and in the manner specifically alleged herein, Defendants' acts and omissions, neglect and default, fell below the applicable standard of care owed inmates in state custody, to-wit:

a.  Beginning no later than November 2016, Durham County Jail officials were aware of Uniece Fennell's mental health problems and suicidality, and they placed her on four-times-an-hour checks following the death of her twin brother.

b.  Jail officials were aware of Uniece Fennell's juvenile status and were aware or had reason to be aware of other adult women continually bullying and harassing Fennell while she was incarcerated in the Durham County Detention Center, with at least one jail official contributing to the bullying and harassment herself.  Jail officials were notified of this officer's behavior on the morning of March 22, 2017, less than twenty-four hours before Fennell's death, in an email from her defense attorney.

c. On the night of March 23, 2017, less than two hours before Uniece Fennell died, jail officials were notified by another inmate that Fennell was threatening to kill herself. The officers on-duty failed to properly notify a supervisor of Fennell's threats to herself as required by jail policies and protocols. Furthermore, jail staff failed to regularly check on Fennell's cell as required by state regulations, and as is specifically required by the jail regulations.

107. Had Defendants acted pursuant to the requisite standards of care owed inmates in state custody and pursuant to state and jail regulations as described above, they could and would have prevented Uniece Fennell's death.

108. At all times material hereto, the circumstances that lead to Uniece Fennell's death on March 23, 2017 were preventable through adherence to well-established federal, state, and jail protocols.

109. Defendants' acts and omissions, neglect and deliberate indifference as specifically described above proximately caused the death of Uniece Fennell on March 23, 2017.

110. As a direct result of Defendant Officers' failures, negligence, and violations of the standard of care, Uniece Fennell took her own life and as such, Plaintiff, on behalf of Uniece's Estate, is entitled to recover compensatory damages in excess of $25,000.00

CLAIM V
Violation of N.C. Gen. Stat. § 58–76–5
(Official Neglect)
(Defendant Sheriff Andrews)

111. The allegations contained in the previous paragraphs of this Complaint shall be fully incorporated and re-alleged as if fully set forth herein.

112. At all times material hereto, Defendant was employed as Sheriff at the Durham County Sheriff's Office.

113. Defendant's neglect, misconduct, and misbehavior while employed in the office of the sheriff were the proximate cause of Uniece Fennell's death. As such, Plaintiff, on behalf of Uniece's Estate, is entitled to recover compensatory damages in an amount in excess of $25,000.00.

<u>CLAIM VI</u>
<u>Wrongful Death Caused by Negligent Hiring</u>
<u>(Defendant Andrews, in his official capacity, Defendant Durham County)</u>

114. The allegations contained in the previous paragraphs of this Complaint shall be fully incorporated and re-alleged as if fully set forth herein.

115. At all times material hereto, Defendant Andrews employed the other Defendants as correctional officers in the Durham County Detention Center for the purpose of monitoring and overseeing inmates and providing for their health, safety, and well-being while in custody.

116. Defendant Henderson and Officers Taylor and Jackson were acting within the scope of their employment with the Sheriff's Office at all times relevant to this action.

117. At the time Defendant Andrews hired and employed Defendant Henderson and Officers Taylor and Jackson, he either knew or should have known:

    a. Of the risks posed by the metal bar installed across the windows of the inmates' cells, particularly given the 2011 report alerting jail officials to the risks, the 2013 suicide of inmate Terry Demetrius Lee, and multiple attempted suicides in the years that followed;

    b. That correctional officers must be adequately trained in suicide response and prevention given the increased risk of suicide in the jail population;

c. That Defendant Henderson is either related to or a close personal friend of at least two of the women housed in the unit for which she was responsible.

118.   At the time that the other Defendants committed the negligent, grossly negligent, willful and wanton, and reckless acts and omissions described above, they were acting within the course and scope of their employment or agency with Sheriff Andrews, as the Sheriff of Durham County, or, in the alternative, Durham County.  As such, Sheriff Andrews or Durham County is liable for the conduct of the other Defendants and such conduct is imputed to Sheriff Andrews or Durham County.

119.   As a proximate result of the negligent hiring of Defendants, Uniece Fennell, a suicidal inmate, was left unattended in her cell with instruments of suicide, and according to the Medical Examiner, did in fact commit suicide on March 23, 2017.  Consequently, Plaintiff, on behalf of Uniece's Estate, is entitled to recover compensatory damages in an amount in excess of $25,000.00.

120.   Furthermore, Plaintiff, on behalf of Uniece's Estate, is entitled to recover punitive damages as set out in N.C. GEN. STAT. § 28A–18–2(b)(5) to punish Sheriff Andrews and Durham County for the illegal, egregiously wrongful, reckless and willful misconduct committed by their agents and employees and to deter other from engaging in similar wrongful conduct in the future.

CLAIM VII
Intentional Infliction of Emotional Distress
(Defendant Michelle Henderson)

121.   The allegations contained in the previous paragraphs of this Complaint shall be fully incorporated and re-alleged as if fully set forth herein.

122.     The complained off actions of Defendant Henderson constitute the common law tort of Intentional Infliction of Emotional Distress.

123.     Defendant intentionally and wantonly engaged in extreme and outrageous conduct by, *inter alia*,

   a.   Deliberately taunting Uniece Fennell by telling her that she would die in prison;

   b.   Deliberately giving inmates who regularly bullied and abused Fennell free reign of the unit while the rest of the women were in lock down;

   c.   Deliberately disregarding the continuous bullying and harassment inflicted by these women upon Uniece Fennell;

   d.   Failing to address or rectify the complained of behavior of the officer and inmates as described in the email from Uniece's defense attorney;

   e.   Refusing to provide Uniece Fennell with protection from certain detainees in her unit, despite notice of legitimate danger against her person.

124.     Defendant Henderson intended to or should have known her conduct would cause Uniece to suffer severe emotional distress.

125.     Uniece Fennell did suffer severe emotional distress as a direct and proximate result of Defendant's actions, and this distress contributed to her suicidality.

<u>CLAIM VIII</u>
<u>Negligent Infliction of Emotional Distress</u>
<u>(Defendant Michelle Henderson, Defendant Sheriff Andrews)</u>

126.     The allegations contained in the previous paragraphs of this Complaint shall be fully incorporated and re-alleged as if fully set forth herein.

127.     The complained off actions of Defendants Henderson and Andrews constitute the common law tort of negligent infliction of emotional distress.

128. Defendants negligently failed to exercise their duty of reasonable care as a prison official by, *inter alia*,

    a. Failing to properly protect Uniece Fennell despite a legitimate threat of danger to her person;

    b. Failing to properly supervise and monitor inmates known to repeatedly communicate threats to Uniece Fennell and to continuously bully and antagonize her;

    c. Failing to address or rectify the behavior of inmates and officers as complained of in the email to prison officials from Uniece Fennell's defense attorney;

    d. Failing to notify a supervisor as to Uniece Fennell's known decline in mental health; and

    e. Failing to properly investigate claims of Uniece Fennell's suicidal nature and known decline into feelings of hopelessness.

129. Defendants should have reasonably foreseen that failure to exercise a duty of reasonable care would cause Uniece Fennell to suffer severe emotional distress or mental anguish as well as physical injury.

130. Uniece Fennell suffered severe emotional distress as a direct and proximate result of Defendant's acts and omissions, resulting in her eventual death on March 23, 2017.

<u>CLAIM IX</u>
<u>Violation of N.C. GEN. STAT. § 162–55</u>
<u>(Defendants Andrews, Henderson, Taylor, Jackson, Stripling)</u>

131. The allegations contained in the previous paragraphs of this Complaint shall be fully incorporated and re-alleged as if fully set forth herein.

132. Uniece Fennell was committed to the custody and care of Sheriff Andrews, Michelle Henderson, FNUs Taylor and Jackson, Officer Stripling, and the other detention staff and

medical and mental health providers who worked at the Durham Jail during the time she was incarcerated.

133. The above-named Defendants who worked at the Durham Jail during Uniece's incarceration were all keepers of the Jail pursuant to N.C. GEN. STAT. § 162–55.

134. As alleged previously, the conduct of these Defendants was so careless and reckless that it demonstrated a total disregard of the consequences and a heedless indifference to the safety, wellbeing, and rights of Uniece Fennell.

135. Defendants' conduct was a proximate cause of Uniece Fennell's death and constituted a wrong or injury pursuant to N.C. GEN. STAT. § 162–55. Consequently, Plaintiff, on behalf of Uniece Fennell's Estate, is entitled to recover from each of these defendants, in their individual and official capacities, compensatory and punitive damages. Furthermore, Plaintiff is entitled to recover treble damages pursuant to N.C. GEN. STAT. § 162–55.

CLAIM X
Action on Bonds and N.C. GEN. STAT. § 58–76–1, *et seq.*
(Defendant Andrews and Defendant Surety)

136. The allegations contained in the previous paragraphs of this Complaint shall be fully incorporated and re-alleged as if fully set forth herein.

137. As alleged herein, Sheriff Andrews neglected the duties of his office and committed wrongful acts as Sheriff of Durham County.

138. Uniece Fennell died as a direct and proximate result of Sheriff Andrews' neglect and wrongful acts in office. Consequently, Plaintiff, on behalf of Uniece's Estate, is entitled to recovery from Surety damages in excess of $25,000.00.

CLAIM XI
For Temporary and Permanent Injunctive Relief
(Defendant Durham County and Defendant Sheriff Birkhead)

139.    The allegations contained in the previous paragraphs of this Complaint shall be fully incorporated and re-alleged as if fully set forth herein.

140.    The loss of life is the result of the longstanding deliberate disregard of structural hazards that are known suicides risks and the result of a longstanding failure to provide adequate medical and mental healthcare.

141.    The loss of life is the result of the failure to segregate the juvenile from the adult populations at the Durham County Detention Facility, in willful violation of federal regulations.

142.    The combined effect of these two separate problems gives rise to the continued danger of imminent and significant loss of life.  In the two years leading up to Uniece's death, there were 27 suicide attempts by hanging.  There have been at least fourteen successfully suicides at the jail since 1998.  In the two years since Uniece's death, there have been an additional three deaths at the jail, attributable to inadequate in-custody healthcare.

143.    The Court should issue temporary and permanent injunction prohibiting Defendants from housing juveniles within sight and sound of the adult population and requiring Defendants provide adequate medical and mental healthcare to all detainees.

<u>PRAYER FOR RELIEF</u>

WHEREFORE, Plaintiff respectfully prays that this Court:

1.    Assume jurisdiction over this action;

2.    Grant Plaintiff a trial by jury;

3.    Declare the acts and omissions described herein violated Uniece Fennell's rights under the Constitution and the laws of the United States;

4. Enter judgment in favor of Plaintiff for compensatory and punitive damages, as allowed by law and determined by a jury in an amount exceeding $75,000.00, against each Defendant, jointly and severally;

5. Award Plaintiff the costs of this lawsuit and reasonable attorneys' and expert fees pursuant to 42 U.S.C. § 1988 and as otherwise allowed by law;

6. Enjoin named Durham County Detention Facility staff and officers from subjecting any inmates in their custody to any unconstitutional treatment and from using the Detention Facility until such unconstitutional practices of jail staff have been corrected. Such a remedy would include a temporary and permanent injunction which would address the longstanding problem of the cell window-bars and the significant risk of hanging, as well as the issue of co-mingling juveniles in the adult jail population;

7. Order any such additional relief as this Court may deem just, equitable, and proper, including but not limited to:

    a. Compensation for pain and suffering of the decedent;

    b. The reasonable funeral expenses of the decedent;

    c. Such punitive damages as the decedent could have recovered pursuant to Chapter 1D of the North Carolina General Statutes had the decedent survived, and punitive damages for wrongfully causing the death of the decedent through malice or willful or wanton conduct;

    d. Treble damages pursuant to N.C. Gen. Stat. § 162–55; and

    e. Nominal damages when the jury so finds.


Respectfully submitted this 20th day of March, 2019.

*/s/ Ian A. Mance*
Ian A. Mance, N.C. Bar No. 46589
Email: ianmance@southerncoalition.org
Whitley Carpenter, N.C. Bar No.49657
Email: whitleycarpenter@southerncoalition.org
Ivy Johnson, N.C. Bar No. 52228
Email: ivyjohnson@scsj.org
Attorneys for Plaintiff
Southern Coalition for Social Justice
1415 W. NC 54, Suite 101
Durham, North Carolina 27707
Telephone (919) 794-4204
Fax: (919) 323-3942

*/s/ William Harry Ehlies, II*
William Harry Ehlies, II, S.C. Bar No. 1857
Federal ID No. 690
Policy Council – Law Enforcement and the
Mentally Ill