**IN THE UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF NORTH CAROLINA**
**CASE NO. 1:19-CV-316**

_____

| | | |
|---|---|---|
| JULIA GRAVES,<br>as Administratrix of the Estate of<br>Uniece Fennell, Deceased, | ) )<br>)<br>) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| DURHAM COUNTY, | ) | |
| | ) | |
| CLARENCE BIRKHEAD, Sheriff,<br>Durham County, | )<br>) | **JOINT SUPPLEMENT TO**<br>**MOTION FOR APPROVAL OF** |
| | ) | **SETTLEMENT AGREEMENT** |
| MICHAEL D. ANDREWS, Former<br>Sheriff, Durham County, | )<br>) | |
| | ) | |
| MICHELLE HENDERSON, former<br>Correctional Officer, Durham Co.<br>Detention Facility, | )<br>)<br>) | |
| | ) | |
| FNU JACKSON, Sergeant, Durham Co.<br>Detention Facility, | )<br>) | |
| | ) | |
| FNU TAYLOR, Correctional Officer,<br>Durham Co. Detention Facility | )<br>) | |
| | ) | |
| TANISHA STRIPLING, Correctional<br>Officer, Durham Co. Detention Facility, | )<br>) | |
| | ) | |
| TRAVELERS CASUALTY AND<br>SURETY COMPANY OF AMERICA,<br>                As Surety | )<br>)<br>) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

NOW COME the Parties, by and through their respective counsel, and jointly provide the Court with the following Joint Supplement To Motion For Approval Of Settlement Agreement pursuant to the Court's Order on April 2, 2019. [D.E. 7].

1

On March 20, 2019, Plaintiff filed this action with the Court. [D.E. 1]. Immediately after initiating this action, the Parties jointly filed a Motion to Approve Settlement Agreement. [D.E. 2]. The case was then assigned to Chief Judge Schroeder and the motion was submitted. On April 2, 2019, Judge Schroeder issued an Order directing the parties to supplement their Joint Motion for Approval of Settlement Agreement with an explanation of the factors they believe support a determination that the settlement is fair and reasonable, including a discussion of the strengths and weaknesses of their respective claims. [D.E. 7]. In accordance with this Order, the Parties submit, by and through their respective attorneys, this summary of the facts, followed by their individual supplementary statements:

## I.    Facts Upon Which There Is No Dispute

1. On July 26, 2016, Uniece ("Niecey") Fennell, then sixteen years of age, was arrested and detained at the Durham County Detention Facility (alternately "Durham County Jail" and "DCDF"). In the early hours of March 23, 2017, Uniece Fennell, then seventeen years old, was found hanging by the neck from a bedsheet attached to a bar that was affixed to the raised window in her cell on the fifth floor of the Durham County jail. Her death was ruled a suicide by the state Office of the Medical Examiner.

2. The Durham County Detention Facility primarily houses people who have been charged but not yet convicted of crimes. Most people incarcerated in the jail are indigent and cannot afford bail. The jail was not built with long-term incarceration in mind, and, for example, lacks an outdoor facility and regular programming.

3. Durham County Detention Facility policies, in accordance with state regulations, provide that minors are to be given sleeping quarters separate from adults. However, federal law provides that a "youthful inmate shall not be placed in a housing unit in which the youthful

inmate will have sight, sound, or physical contact with any adult inmate . . . ." Prison Rape Elimination Act, 28 C.F.R. § 115.14.

4. Uniece Fennell was housed with the regular adult population in the Durham County Jail.

5. On August 31, 2017, five months after Niecey's death, the North Carolina State Legislature passed the Juvenile Justice Reinvestment Act, which changes the age of criminal responsibility from sixteen to eighteen. Juvenile Justice Reinvestment Act, 2017 N.C. SESS. LAWS 157. A key component of this act will require that "[a]ll persons less than 18 years of age who are ordered to be held in custody prior to their trial or adjudication, whether in adult court or juvenile court, shall be housed in an approved Juvenile Justice Section facility, and not incarcerated in county jails (unless the county jail has an agreement with the Juvenile Justice Section to house juveniles)." JUVENILE JURISDICTION ADVISORY COMM. – LEGIS. & FUNDING RECOMMENDATIONS: RAISE THE AGE LEGIS. RECOMMENDATIONS (Jan. 17, 2019).

## II.  Plaintiff's Supplementary Statement

6. This is a case where a teenaged girl was held in custody at an adult jail with adult women who regularly bullied and antagonized her, up until and including the day of her death by suicide.

7. Plaintiff and her attorneys have reason to believe Niecey was held in custody primarily so she could testify against her co-defendants. Niecey's defense attorney, Alexander Charns, indicated his belief that the case against Niecey would eventually be dismissed. Since Niecey's death, the cases against her two co-defendants have been dismissed.

8. At one of Niecey's preliminary bond hearings, the father of the victim appeared and asked the Court that her bond be unsecured so she may be able to go home. Instead, the Court held Niecey on a five million dollar secured bond.

9. While Niecey was in custody, the jail staff charged with caring for her physical and mental well-being ignored clear, known signs of her emotional distress and in certain instances contributed to the bullying and antagonism.

10. Niecey had previously been placed on suicide watch and no one in her family, not even her mother, was ever notified.

11. Despite making threats to her own life earlier the night of her death, jail staff determined her threats should not be taken seriously and she was left alone in her cell with the instrumentalities of her suicide and no close regular observation.

12. The Jail facility has a long history of suicides by detainees who use the window bars to hang themselves. The Sheriff who operates the Detention Facility has been on notice of the hazard but that particular hazard had not been remedied at the time of Uniece's death. Uniece used the sheets on her bed and the bars in the window to hang herself.

13. Durham County has the unfortunate distinction of being only one of three counties across the country to have a juvenile die at an adult jail.

**A. Uniece "Niecey" Fennell, was a seventeen-year-old juvenile in an adult facility with a known history of suicidality. Jail staff failed to conduct appropriate medical and mental health assessments and failed to provide appropriate treatment, resulting in Niecey's death.**

14. On March 23, 2017, seventeen-year old Uniece "Niecey" Fennell was found dead in her cell at the Durham County Detention Facility.

15. At the time of her death, Niecey, a juvenile, had been held in pretrial custody at an adult facility for approximately nine months. Niecey was found by jail officials hanging from a bedsheet tied to the bar across the raised window of her cell.

16. In November 2016, approximately four months prior to her death, Niecey's twin brother Demoraea was shot to death in Durham. Niecey and her brother were extremely close and following his murder she fell into a deep depression and was subsequently placed on suicide watch at the Detention Facility for a brief period.

17. Niecey was removed from suicide watch only three to four days later and put back into the general population where she was subjected to verbal abuse by both fellow detainees and jail staff.

18. Defendant Michelle Henderson, who was, at the time, an officer at the jail, had a personal relationship with a number of the women subjecting Niecey to verbal and physical abuse and that Defendant Henderson would give these women preferential treatment.

19. The abuse persisted throughout the remainder of Niecey's time in detention and was known to the officers charged with her care.

20. Additionally, Niecey told her attorney, Alexander Charns, of the abuse and he in turn alerted jail administrators and asked them to investigate, but they did not.

21. This failure to investigate and failure to appropriately treat Niecey's known mental health problems caused Niecey to take her own life.

**B. On the night of her death, Niecey made specific threats to take her own life but jail staff, without consulting a mental health expert, made the unilateral decision not to take her threats seriously and left Niecey in her cell with the instrumentalities of her suicide.**

22. On the night of her death, Niecey was crying so loudly that Defendant Jackson, an officer on duty at the time, went to her cell to check on her well-being. After only a brief

conversation, Jackson determined Niecey was fine and left her alone in her cell. Later that night, Niecey directly threatened to kill herself.

23. The North Carolina Medical Examiner's report on Niecey's death states she had been making suicidal threats and had specifically stated she wanted to kill herself, but no one at the jail took her seriously.

24. Durham County Jail policies at the time of Niecey's death allowed officers to make the ultimate decision as to whether or not to place a detainee on suicide watch, which is in direct contravention to national jail standards.

25. Not only was Niecey's history of suicidality known to jail staff, but she had directly threatened suicide the night she died. Yet, jail staff refused to consult with a mental health expert before deciding against placing her on suicide watch.

26. Jail administrators, the Durham County Sheriff's Office, and the Durham County Commissioners have publicly acknowledged that policies put in place for the protection of detainees were not followed in this case and that known hazards utilized in prior suicides and suicide attempts had not been remedied prior to Niecey's death. These failures and the failure of the jail staff to consult a mental health expert before unilaterally deciding to leave Niecey alone in her cell with the instrumentalities of her suicide proximately caused her death.

**C. Durham County Jail staff failed to follow established safety policies and procedures and failed to supervise and observe Niecey as required, leaving her with enough time to successfully commit suicide.**

27. Following Niecey's death, a compliance investigation was conducted by Chris Wood of the Division of Health Service Regulation. Wood's investigation found Durham County

6

jail staff failed to follow established safety policies and procedures in at least two different ways.

28. According to the investigation, jail staff failed to make the required supervision rounds on the night of Niecey's death. State jail policies require officers to make direct visual observation of all detainees at least twice per hour. Based on staff interviews in the course of the investigation it was determined that between 2:08am on March 22, 2017 and 9:56am on March 23, 2017, there was only one supervision round conducted during the 11am, 12pm, 8pm and 10pm hours, and no supervision rounds during the 2pm and 5pm hours.

29. The investigation found jail officials failed to follow established safety policies in protocols by failing to place Niecey on a four times per hour supervision schedule. State jail policies require officers to directly observe four times per hour detainees who display the following behavior "(3) stating he will do harm to himself;" or "(5) displaying erratic behavior such as screaming, crying, laughing uncontrollably, or refusing to talk at all."

30. Additionally, State jail policies require any person with a previous record of a suicide attempt or a previous record of mental illness be observed at least four times per hour. The investigation concludes that the officer on duty the night Niecey hung herself observed Niecey acting strangely and was told Niecey was threatening self-harm but only conducted 2.5 supervision rounds between 1:00am and 2:48am, when Niecey was found hanging by her bedsheet.

31. This failure to conduct the required supervision rounds left Neicey with enough time to fashion her bedsheet into a rope, tie it to her window bar and hang herself.

**D. The Durham County Sheriff and the Durham County Commissioners had documentation of the specific suicide risk posed by the cell window bars dating back**

**at least fifteen years but both parties failed to do anything to about it, allowing Niecey to commit suicide by hanging herself from the window bar in her cell.**

32. At the time of Niecey's death, the type of bar from which she hung herself was ubiquitous throughout the jail and had been a source of controversy for a number of years.

33. There have been numerous suicide attempts by hanging at DCDF, one of which occurred while Niecey was in custody and that she witnessed, and twelve confirmed deaths by hanging since 1998.

34. According to the Durham County Sheriff's Office, there were 15 attempted suicides in 2015 and 12 attempted suicides in 2016. In just the two years since Niecey's death in 2017, there have been an additional three deaths by unknown circumstances.

35. The hazard posed by the window bars was well-known and documented as early as 2002. A June 27, 2002 memorandum from the Sheriff's Office states that window bars in the cells were being used as a means to commit suicide.

36. The same memorandum states four suicides by hanging occurred between 1996 and 2002. Fifteen years after the first memorandum documenting the suicide risk presented by the window bars, Niecey successfully hung herself by that very method.

37. In 2003, Sheriff Andrews' predecessor wrote a letter to the then County Manager, urging "every possible attempt be made to correct these structural facility problems as soon as possible." These corrections were never made and the project was never funded.

38. In 2011, Defendant Andrews assumed office and was fully aware that the failure to make these structural changes increased the prospect of future detainee suicides.

39. On August 14, 2012, Defendant Andrews convened a suicide prevention meeting and specifically discussed proposals to modify the facility and remove the window bars. These proposals also failed to come to fruition and the modifications were not made.

40. The State of North Carolina has urged the Sheriff's Office to make physical modifications to the jail to reduce suicide hazards more than once in the years leading up to Niecey's death.

41. On March 17, 2011, state jail inspector Litonya Carter identified the window bars as hanging hazards and advised jail administrators to look into alternatives.

42. On June 26, 2013, two months after Terry Demetrius Lee hung himself at the jail by tying a bedsheet to the bar in his cell, State Jail Consultant and Inspector Chris Wood wrote a letter to Defendant Andrews, drawing attention to the hazard presented by these types of bars.

43. Four years after Wood's letter and six years after Carter's report, jail official Sean Barnes told the Durham Grand Jury that at least 40% of the window bars had yet to be modified and there were no plans to address them. This was relayed to the Grand Jury on June 26, 2017, three months after Niecey's suicide by hanging. The Defendants' failure to address this known suicide risk proximately caused Niecey's death.

44. The Durham County Sheriff's Office and the Durham County Commissioners failed in their duty of care owed to Niecey, and they failed in multiple ways. Each of these failures, discussed above, is the proximate cause of Neicey's death and a stand-alone theory of liability that would allow Plaintiff to prevail in this case.

45. For these reasons, Plaintiff contends the terms and conditions of the Memorandum of Agreement are fair and reasonable.

### III. Defendant Sheriff's Office's Supplementary Statement

46. Defendant Sheriff Birkhead defeated Defendant Former Sheriff Andrews in Durham County's primary elections in May, 2018 and was sworn into office in December, 2018.

9

47. A key pillar of Sheriff Birkhead's campaign was eliminating the suicide risks at the Durham County Jail and facilitating crisis intervention for all officers staffing the jail.

48. At the time Uniece was first placed on suicide watch it was a pre-emptive decision by detention facility staff. Jail staff learned of her brother's death and removed her from a situation in which she could harm herself.

49. Before being placed back in general population, Uniece was fully evaluated by mental health staff and it was determined she could be placed back in her regular pod.

50. During the time she was detained at the Durham County Detention Facility, there was no designated mental health pod. Mental health services are provided through the county by three counselors and psychiatrist. A detainee requiring additional mental health services either had to be approved for outside treatment or was placed in a special suicide proof cell and placed on lock-back. It is generally thought regular population is a better environment.

51. There are kiosks strategically placed around the detention facility that detainees can use to lodge formal complaints. Those complaints are then reviewed by jail staff and either escalated for further investigation or dismissed.

52. Plaintiff has alleged Uniece suffered bullying at the hands of other detainees and jail staff. Had Uniece used the kiosk to file a grievance on these issues, an investigation would have been initiated.

53. The morning before Uniece died, her defense attorney did email the then jail administrator to alert him to Uniece's being bullied. At the time, an investigation was commenced.

54. The individual officer named by Plaintiff as being Uniece's primary antagonist, Michelle Henderson, had left her position with the Sheriff's office prior to Uniece's death. Ms.

Fennell denied harassment by any other staff member and did not identify harassment by any detainees.

55. The hanging risk posed by the window bars was first identified by Sheriff Hill, but neither he nor Defendant Andrews were successful in having them removed.

56. By October 2018, suicide risks presented by the window bars had been corrected. Since taking office in December, 2018, Sheriff Birkhead was able to confirm all window bars had been removed and he continued to ensure that all other known hanging risks, such as HVAC vents, were fully removed from the jail by the end of 2019.

57. At the time of Uniece's death, the jail policy did not specifically require staff to refer any and all potential suicide risks to mental health for evaluation.

58. At the time of Uniece's death, the officers on duty in her pod, after hearing Uniece had made threats to her own life, went to Uniece's cell and questioned her as to the seriousness of these threats.

59. Only after the officers on duty at the time of Uniece's death were satisfied Uniece was not about to take her own life did they leave her alone in her cell.

60. At the time Uniece was arrested, she was sixteen years old and an adult in the eyes of the North Carolina criminal law.

61. Uniece was given her own cell and did not have a roommate for the duration of her period of incarceration, in compliance with the requirements of PREA and state regulations.

62. Throughout Uniece's time in the Durham County Detention Facility, her mother, Julia Graves, the Plaintiff in this case, was living in Las Vegas.

63. Julia Graves did not make herself available to jail staff for involvement in Uniece's mental health treatment.

11

64. It is the Sheriff's position that even if Plaintiff had remained in Durham while Uniece was incarcerated, HIPAA, the Health Insurance Portability and Accountability Act, prevents jail staff from revealing a detainee's medical and mental health status to family members unless staff are specifically requested or allowed to do so by the detainee his or herself.

65. Sheriff Birkhead was sworn into office in December, 2018, more than a year after Uniece's death.

66. A key aspect of Sheriff Birkhead's election platform was reforms at the Durham County Detention Facility. As such, Sheriff Birkhead recognizes the failings in the administration before his and the failings that lead to Ms. Fennel's death.

67. Sheriff Birkhead has only been in office four months and has already made significant changes, such as a Crisis Intervention Training for all jail staff and continuing the plan to have all known suicide hazards removed from the jail.

68. Most of Sheriff Birkhead's efforts are in direct response to Ms. Fennel's death and much of what is contained in the Memorandum of Agreement are policies Sheriff Birkhead committed to.

69. For the reasons stated above, the Durham County Sheriff contends the terms of the Memorandum of Agreement are fair and reasonable.

IV.    **Defendant Durham County's Supplementary Statement**

70. According to information provided by Plaintiff's counsel Uniece had a traumatic childhood in California that continued when she moved to North Carolina with her family.

71. She and her twin brother, Demoraea, were born to their mother, Julia Graves, out of an abusive relationship.

72. In 2003, Julia tired of the physical abuse, drug use, and threats of violence forced the father out of the house. Uniece was depressed and missed a fair amount of school because of family turmoil while in middle school.

73. In an effort to give her children a fresh start, Julia moved the family to Durham, N.C. Uniece's twin brother avoided the move by running away, but finally reunited with the family in Durham.

74. After the Plaintiff moved to Las Vegas, Uniece Fennell, at age 16, was arrested on July 26, 2016 for murder and was a pre-trial detainee in the Durham County Detention Facility. Preliminary evidence suggested that Uniece was the driver of an automobile involved in a drive-by shooting.

75. Prior to incarceration Uniece was not enrolled in school, was undergoing mental health treatment and her Facebook account and posts suggest that she was heavily involved in gang activities.

76. While incarcerated Uniece's twin brother was killed and she was placed on suicide watch from November 1 until November 3, 2016. Eventually she was removed from suicide watch and placed back into a single cell. However, on March 23, 2017 she committed suicide by hanging.

77. The Durham County Board of Commissioners, hereinafter Durham County, has been apprised of suicide hazards, within the Durham County Detention Facility, since at least 2002. The record reflects that Durham County has not been sued for a suicide death within the facility prior to this case.

78. Over the years, Durham County has taken steps to address suicide hazards and youth housing at the detention center. Some of these measures include, but are not limited to:

a. Durham County provided $19,500 in fiscal years 14 and 15 for the replacement of HVAC vents in the Durham County Detention Center. In fiscal year 16, that amount increased to $23,000. In fiscal years 17, 18, and 19, the amount was increased to $25,000 each year. The total spent and allocated for HVAC security vents for the 6 year period is $137,000. As of March 2017, the HVAC security vents were replaced in more than 80 cells at the jail; and

b. Durham County provided $90,000 in late fiscal year 2016-2017 to complete anti-suicide window modifications in the Detention Center; and

79. Durham County also ensures that the physical and mental health of all jail detainees are properly addressed. These measures include but are not limited to:

a. Upon intake, individuals that will be detained are interviewed by a nurse regarding current medical issues, diagnoses, medications, treatment and history of past illnesses. A preliminary nursing pathway, also known as a care plan, is developed based on the information received; and

b. Nursing personnel are available to inmates for Sick call appointments. While there is a kiosk to make a request, verbal requests are accepted as well;

c. Health assessments are completed after a detainee has been onsite for 14 consecutive days, and another one conducted after a detainee has been on site for 12 months or more; and

d. Currently, all individuals booked into the jail complete an intake screening with the nursing staff from Correct Care Solutions (CCS), the entity under contract with the Durham County Health Department (DCHD) for medical screening

and follow-up care. The intake also screens for a number of items related to alcohol and substance use, benzodiazepines, opioids and other drugs; and

e. The Brief Jail Mental Health Screen (BJMHS) is embedded in the initial intake. Positive screens on the BJMHS are referred to the Jail Mental Health Team for assessment (including suicidality and risk of harm to self and others) and determination of level of care. Those with severe and persistent mental illness are enrolled in the chronic care caseload, receive regular mental status exams and are seen by the contract Jail Psychiatrist. Other inmates requiring psychotropic medications are also seen on a routine basis, and any inmate requesting to be seen by jail mental health staff will receive a face-to-face contact.

80. The County has made reasonable efforts over the years to make modifications to the jail with the aim of reducing suicide hazards. Moreover, the County, at all relevant times, had reasonable policies and procedures in place to identify and treat inmates with significant mental health needs.

81. In addition to the policies, procedures, and abatement measures, had this case gone to trial, Durham County would have presented evidence of the decedent's troubled past, including her alleged involvement with gang members, her lack of enrollment in school, and her lack of employment.

82. Durham County for these reasons contends the terms and conditions of the Memorandum of Agreement are fair and reasonable.

**V.    Settlement Negotiations**

83. Since April 2018, Niecey's attorneys have been regularly meeting with County and Sheriff representatives to discuss the case and a number of issues.

84. In preparation for the first meeting between all the Parties, Plaintiff prepared a list of guiding principles that formed the framework for the ensuing discussion and the negotiated resolution. That list was presented to all Parties and contained the following principles:

   a. All suicide hazards that have been identified by state jail inspectors must be remedied;

   b. Under no circumstances will a detainee under the age of 18 be permitted to come into contact with adult detainees;

   c. All jail staff must be properly trained to recognize the signs of self-harm and suicidality and be trained to appropriately respond;

   d. Jail staff conducting intake of minors must be trained mental health experts and must seek input from parents about the detainee's mental health history;

   e. Jail staff should never discuss one detainee's circumstances with other detainees;

   f. Complaints filed through the kiosk need to be properly investigated, and complainants need to be informed of their outcome;

   g. There will be constant video monitoring of any individual for whom there is some reason to think might harm themselves and any area of the jail that has been identified as having un-remedied suicide hazards will be under constant video monitoring; and,

   h. There must be meaningful accountability for staff who violate DCDF policies and procedures.

16

85. The Parties met regularly to discuss the ongoing progress of policy changes and physical modifications at the jail and to discuss potential settlement resolutions.

86. These regular meetings culminated in a twelve-hour mediated settlement conference, which occurred on March 8, 2019 and was mediated by Asa Bell.

87. The result of the eleven months of regular meetings and discussions and the mediated settlement conference is the settlement put forth to the Court by the Parties.

88. Below is a description of the various aspects of the settlement agreement and the progress that was made during the course of the discussions between the Parties.

A. **Physical Modifications to the Jail**

89. At the time of Niecey's death, at least 40% of the window bars, a well-known and well-documented suicide hazard, were unmodified with no plan to make the final alterations.

90. In the course of negotiations, Durham County and the Sheriff's Office committed to removing all the window bars in the jail. An independent consultant and architect contracted by the Plaintiff subsequently confirmed that all the window bars at the Durham County Detention Facility have been adequately modified.

91. During an inspection of the jail, Plaintiff's independent consultant identified additional hanging hazards within the jail. The County subsequently committed to having all identified suicide hazards remedied by the end of 2019.

92. The Board of County Commissioners approved $946,486 for the purpose of making structural modifications to the existing wall-mounted steel jail beds and replacing the existing HVAC grills inside of the holding cells throughout the detention center residential pods. This project will replace HVAC grills in 494 cells (988 grills) and will modify all 160 jail beds.

93. Additionally, Sheriff Andrews began and Sheriff Birkhead is continuing, an effort to create separate mental health pods for detainees with heightened levels of mental health requirements, such as suicidality.

**B. Policy Changes at the Jail**

94. Colonel Prignano, who became the jail administrator after Niecey's death, has changed the jail's policy in regards to detainees making suicide threats. It is no longer up to an officer's discretion whether to take a detainee's suicide threat seriously.

95. Additionally, Sheriff Birkhead has begun the process of having all jail officers undergo Crisis Intervention Training, having all deputies be certified in CIT, meaning they have passed the exit exam, and has indicated he expects this shall be completed by the end of December, 2019.

96. Sheriff Birkhead and the County have also agreed to provide qualified medical personnel to conduct intake assessments, provide periodic assessments, and to be available 24/7 for any medical or mental health needs that may arise at the jail.

**C. Juvenile Population**

97. Since Niecey's death, a new district attorney and a new sheriff have been voted into those respective offices. Since they have each taken office, the juvenile population at the jail has been reduced from a daily average of approximately 21 to a daily average of approximately 9.

98. On August 31, 2017, the North Carolina Legislature passed the Juvenile Justice Reinvestment Act ("Raise the Age"), which changes the age of criminal responsibility from sixteen to eighteen. This change is slated to go into effect on December 1, 2019.

99. The Juvenile Jurisdiction Advisory Committee was tasked with issuing a series of recommendations for addressing the juvenile population once "Raise the Age" goes into effect.

100. A key aspect of these recommendations states "[a]ll persons less than 18 years of age who are ordered to be held in custody prior to their trial or adjudication, whether in adult court or juvenile court, shall be housed in an approved Juvenile Justice Section facility, and not incarcerated in county jails (unless the county jail has an agreement with the Juvenile Justice Section to house juveniles)."

101. There is currently no opposition to this recommendation and it is expected to pass in the legislature in the coming weeks.

102. Durham County is one of only a few counties in North Carolina to operate a youth detention facility.

103. Durham County provided $87,600 in the current fiscal year to start a master planning process for the Juvenile Justice Reinvestment Act (which impacts youthful offenders and their housing) and to complete an environmental assessment for the Durham Youth Home (the County's juvenile detention facility).

104. Durham County continues planning work on the capital project focused on possibly replacing the existing youth detention facility with a new facility in response to the new "Raise the Age" legislation that will be enacted in December, 2019. The Youth Home will be able to begin serving 16 and 17 year old's. The new facility will add an additional 10 beds, bringing the total number of beds to 36 to accommodate the additional 16 and 17-year old youth.

19

105.    Durham County budgeted $1.5 million in a project account in FY18/19 for design and preliminary activities for this capital project.

106.    The Durham County Board of Commissioners, by way of the Memorandum of Agreement in this case, has committed to passing a policy that will prioritize beds in the Durham Youth Home for youths, such as Niecey, who are arrested and live in Durham County.

**D.  Memorandum of Agreement**

107.    On March 8, 2019 the Parties began a pre-filing mediated settlement conference mediated by Asa Bell.

108.    Present at the mediation were the Parties to this case as well as a representative of Wellpath, LLC, the medical services provider for the Durham County Detention Facility.

109.    The Parties engaged in a mediated settlement conference that lasted over twelve hours, the result of which was the Memorandum of Agreement signed by all involved.

110.    The Memorandum of Agreement signed by the Parties embodies the Plaintiff's primary policy goals and takes into consideration the efforts made by the County and Sheriff over the course of the discussions.

111.    Each factor of the Memorandum of Agreement aims to provide some sort of remedy to at least one of the previously identified failings in this case.

112.    Furthermore, a key aspect of the Memorandum of Agreement that was agreed to by all Parties is to move the Court to incorporate the terms and conditions of the negotiated settlement into the Court's order disposing of the case.

113.    Finally, Plaintiff's attorneys presented the mediator and the Defendants with a list of comparable cases of jail deaths and suicides with settlement amounts and jury verdicts ranging from as little as $150,000.00 to $10,000,000.00.

114.    Over the course of the thirteen-hour mediation, Plaintiff and Defendants went back and forth a number of times debating damages and the value of the case.

115.    Ultimately, the parties identified a group of cases with settlement amounts averaging $700,000.00 as being the most factually comparable to the case at hand.

116.    The agreed to settlement amount of $650,000.00 is a fair and reasonable amount.


WHEREFORE, for the reasons stated above, the Parties contend all factors contained in the Memorandum of Agreement are fair and reasonable and respectfully request the Court grant the Parties' Joint Motion for Approval of Settlement.


This the 16th of April, 2019,


/s/ Ian A. Mance                                          /s/ Lowell Siler
Ian A. Mance, N.C. Bar No. 46589          Lowell Siler
Email: ianmance@southerncoalition.org    County Attorney
Whitley Carpenter, N.C. Bar No.49657     Email: lsiler@dconc.gov
Email: whitleycarpenter@southerncoalition.org    Willie Darby
Ivy Johnson, N.C. Bar No. 52228            Email: wdarby@dconc.gov
Email: ivyjohnson@scsj.org
Attorneys for Plaintiff                           *Attorneys for Defendant*
Southern Coalition for Social Justice       *Durham County*
1415 W. NC 54, Suite 101
Durham, North Carolina 27707               /s/ Stephany Hand Biggs
Telephone (919) 794-4204                       Stephany Hand Biggs
Fax: (919) 323-3942                                Durham County Sheriff's Attorney
                                                              Email: shandbiggs@durhamsheriff.org
/s/ William Harry Ehlies, II
William Harry Ehlies, II, S.C. Bar No. 1857    *Attorney for Durham County Sheriff*
Federal ID No. 690

Policy Council – Law Enforcement and the Mentally Ill
Building A, Suite 201
310 Mills Avenue
Greenville, South Carolina 29605
864-232-3503
hank@ehlieslaw.com

*Attorneys for Plaintiff*